# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

TRAVELERS INDEMNITY COMPANY,   )
as subrogee of SMOKY MOUNTAIN   )
LASER and IDM, INC.,   )
    )
    **Plaintiff,**   )
    )
vs.   )   **CIVIL ACTION NO. 3:02-CV-491**
    )   **(Phillips/Guyton)**
**INDUSTRIAL PAPER & PACKAGING**   )
**CORP.,** *et al.*,   )
    )
    **Defendants.**   )

### ORDER

This matter is before the Court upon multiple motions filed by parties, including

motions to reconsider, motion to file cross claims, Daubert motions, and various motions

in limine. Replies and responses were received by the Court, and oral argument was taken

on December 12, 2006. The Court ruled on many of the motions presented at the hearing

but reserved several motions for further consideration. For the reasons stated at oral

argument, defendant's motion for leave to file cross-claim [Doc. 139] is **GRANTED**;

defendant's motion in limine regarding testimony of Brad White and Dayne Grey [Doc. 174]

is **DENIED**;[1] defendant's motion in limine to prohibit any statements or references intended

to incite anti-Venezuela sentiment or anti-Hugo Chavez sentiment [Doc. 175] is **GRANTED**;

---

[1] Plaintiff was directed and ordered to produce expert disclosures within 10 days of the motions hearing date. The Court also stated that further discovery and rebuttal experts regarding this narrow issue would be permitted.

and plaintiff's motion for leave to take the deposition of Robert Montgomery for the purposes of presentation at trial [Doc. 210] is **GRANTED**.

For the reasons that follow, defendants' motions in limine to bar all testimony of Rodney E. Fowler for spoilation of evidence [Doc.s 167, 169, and 170] are **DENIED**; defendants' motions in limine to exclude the proposed testimony of Andrew T. Armstrong, Ph. D. [Doc.s 137, 140, and 152] are **GRANTED in part** and **DENIED in part**; defendants' motions to reconsider the Court's memorandum and opinion [Doc.s 155 and 178] are **GRANTED in part** and **DENIED in part**; defendant's motion in limine prohibiting any evidence alleging reliance on the skill/judgment of Industrial Paper of its salesman [Doc. 163], as well as defendants' motions in limine regarding implied warranty of fitness for a particular purposes [Doc.s 180 and 184] are **DENIED**; defendants' motions in limine to exclude from evidence the hearsay statement allegedly made by Ronald W. Ogle to plaintiff's expert Rodney E. Fowler [Doc.s 171 and 185] are **DENIED**; and defendant's motions in limine to exclude from evidence the testimony of Rodney E. Fowler on the basis that there is no evidentiary foundation to support his testimony [Doc.s 182 and 186] are **DENIED**.

## I.    Introduction

As the facts of the case have been fully discussed in previous motions and orders, the Court omits the factual background of the case and only inserts relevant facts for the purposes of the Court's reasoning.  Further, the Court merely provides an abridged

summary of the motions for the purposes of this opinion.  Also, for the purposes of this memorandum and opinion, the term "plaintiff" shall refer to the arcade and its operators, as well as Travelers Indemnity Company.

## II.    Motion in limine to bar all testimony of Rodney E. Fowler for spoliation of evidence

### A.    Argument

Citgo Petroleum Corporation ("Citgo") asserts that plaintiff failed to preserve ductwork, an exhaust fan motor, and a transformer from the laser tag facility, while fully aware that this evidence was important in proving/disproving plaintiff's causation theory. Thus, Citgo asserts that this failure constitutes spoliation of the evidence in that no investigation of the evidence is possible.  Citgo presents an affidavit from C. Monroe Copeland in support of its spoliation argument.  According to Mr. Copeland, the mineral oil would have condensed into the fibers of the ductwork insulation and some of the oil would have remained in these fibers after the fire.  Mr. Copeland states that several tests could have been performed to detect the presence of the mineral oil in the insulation of the ductwork and whether and where combustion took place.  Further, he states that the metal ductwork could have been tested to detect if the mineral oil was present.  Mr. Copeland concludes that without the ductwork, etc., whether the mineral oil was present in the ductwork, whether combustion occurred, and whether vitamin E (a component of the mineral oil) was present, cannot be answered.  Additionally, Citgo cites authority, some

Tennessee law, where the remedies to issues of spoilation were dismissal of the case and/or exclusion of the expert. These cases tended to involve items that could easily be stored, such as a television or automobile. Citgo also asserts that the retained fire investigator, Rodney Fowler, did not comply with various NFPA codes in his investigation of the fire. In sum, Citgo states that the testimony of Mr. Fowler should be excluded or that plaintiff's claims and complaint should be dismissed with prejudice.

Ronald Ogle and Ogle's Repair Company ("Ogle") filed a joinder to Citgo's motion. Also, Venture Tech, Inc. ("Venture Tech") filed a joinder, stating that Citgo sold them the subject mineral oil and that the legal arguments raised by Citgo would apply with equal force to the claims brought by Venture Tech. Thus, Venture Tech joins in Citgo's motion.

In response, plaintiff states that the Court has previously addressed these issues on two separate occasions, specifically in two memorandum and opinions with respect to defendant Ogle's motions for summary judgment. Plaintiff also asserts that the requested sanctions are too harsh; that courts generally are reluctant to dismiss a lawsuit on spoilation; that there was no evidence that the plaintiff could have practically collected the subject items without undue hardship and extreme financial burden (the HVAC unit is 5 tons); that the diffusion fluid consumed itself in the fire; and that Mr. Fowler properly documented the fire scene in accordance with NFPA 921.

B.    Applicable law and analysis

Tennessee courts have the discretion to sanction destruction of evidence and to impose sanctions appropriate under the circumstances of each case. The subject evidence that the defendants desired plaintiff to preserve includes ductwork, an exhaust fan motor, and a transformer from the laser tag facility. While the Court is aware that this evidence may have been important in proving or disproving plaintiff's causation theory, the Court finds that the sanctions requested by the defendants are unduly harsh. The Court believes that the issue can be addressed in questioning the credibility and veracity of Mr. Fowler's theories and arguments. Moreover, the defendants' ability to discredit and call into question both Mr. Fowler's fire scene investigation and his analysis, militates against substantial prejudice to the defendants. *See Roskam Baking Co. v. Lanham Machinery Co.*, 87 F.Supp.2d 758 (W.D. Mich. 1999).

The plaintiff states that some defendants have retained their own experts on the issue and have developed theories as to the cause of the fire. The Court therefore finds that the defendants are able to develop their own theories regarding the possible cause of the fire and to call into question the theories put forth by Mr. Fowler. *See id.* For further reason, the Court reflects that preserving all of the evidence that defendants demand is not feasible nor realistic. This is not a case involving preservation of a computer, automobile, or paper file, items that are easily collected, stored, and preserved. The matter involves a 5 ton HVAC system with a network of ductwork, as well as other substantial machinery. Defendants' argument that the external fan motor and a cross section of the ductwork could

have been preserved, at the very least, is noted and will be a proper area for cross-examination at trial.  In light of this discussion, defendants' motions regarding spoliation of the evidence is denied.

### III.  Motion in limine to exclude expert testimony of Andrew Armstrong

#### A.  Argument

It is proposed that Dr. Andrew T. Armstrong, Ph.D and CPC, intends to testify that the wording and warnings contained in the material safety data sheets ("MSDS") for diffusion fluid provided by Industrial Paper and Packaging Corp. ("Industrial Paper") are "not appropriate, [are] wrong, and [are] very misleading," i.e. the word "non-flammable" should not have been used in the MSDS.  Although not included in Dr. Armstrong's report, it also appears from his deposition testimony that Dr. Armstrong might intend to render an opinion as to the MSDS that Citgo disseminated to the public.

##### i)  Citgo

Citgo is in the upper chain of distribution and put out its own MSDS, which did not state that the fluid was "non-flammable."  Further, it appears that Citgo's MSDS was not delivered to the end-user, the arcade.  However, Citgo believes that by discussing the diffusion fluid at issue in this case, Dr. Armstrong's testimony will also address issues

concerning Citgo and its MSDS's statements and warnings. Citgo advances various arguments.

First, Citgo asserts that Dr. Armstrong is not competent to provide expert testimony regarding warnings on an MSDS. Citgo asserts that since Dr. Armstrong neither has education nor experience in writing or reviewing MSDS's, he should be prevented from testifying on the issue of MSDS warnings. Citgo states that although Dr. Armstrong and/or his firm have been asked to supply data that actually goes into an MSDS, he and/or his firm do not perform the actual writing or warnings that are used in MSDS's. Citgo notes that Dr. Armstrong's testimony is addressed directly to the wording on the MSDS and that, while he may have training and experience in investigating chemicals in suspect fire debris or experience with various chemicals, he does not have the necessary training or experience to address the types of wording and warnings used in a MSDS. Citgo cites essentially two cases to support its proposition.

In the first case, *Johnson v. Manitowoc Boom Trucks, Inc.*, 406 F.Supp.2d 852 (M.D.Tenn. 2005), the Court found that the proposed expert had "no specific education on warnings, no specific training on warnings, ha[d] never done any testing of proposed warnings, and no warnings that he drafted ha[d] ever been actually used on equipment in the field."[2]   In the second case, *Patterson v. Central Mills, Inc.*, 64 Fed.Appx. 457 (6th Cir. 2003), the Court stated that the expert "had never written flammability warnings for clothing,

---

[2]The expert, a consultant with a masters in mechanical engineering, opined that the crane's warnings should have included that the crane might tip over in certain situations.

ha[d] no specific education on warnings, had no specific training with respect to warnings on clothing, and had never written an article regarding clothing subject to peer review." Both experts were excluded from testifying on the issue of appropriate warnings.  In light of these cases, Citgo argues that the lack of Dr. Armstrong's knowledge, skill, experience, training, and education regarding MSDS warnings should preclude his testimony.

Second, since Dr. Armstrong had not reviewed the MSDS provided by Citgo before writing his report (only the MSDS provided by Industrial Paper), Citgo asserts that Dr. Armstrong should not be able to offer opinions as to Citgo's MSDS.[3]  Third, since Dr. Armstrong has no knowledge regarding the contents of the labels on the containers that arrived at Q-Zar, he should not be permitted to give testimony on whether Citgo or any other entity provided sufficient warnings to the end user regarding the properties of diffusion fluid.  Fourth, since Dr. Armstrong has not tested the fluid, he should not be able to offer any opinion on the properties or qualities of the fluid.  Fifth, Citgo contends that his testimony would not assist the trier of fact to determine a fact in issue because his testimony is focused on the warnings of flammability, which the jury should understand; further, his testimony may confuse the jury, that is, the jury may confuse Industrial Paper's MSDS with Citgo's MSDS.  Lastly, Citgo asserts that since Dr. Armstrong has not satisfied the Daubert factors, which include testing, peer review, error rate, and acceptance in the applicable community, his testimony should be excluded.

---

[3]However, the Court notes that Citgo's MSDS was reviewed the day of Dr. Armstrong's deposition.  Further, Dr. Armstrong did provide testimony as to Citgo's MSDS in his deposition.

ii)    <u>Venture Tech</u>

Venture Tech joins in Citgo's motion and also presents additional arguments. Venture Tech submits that the issue of effect of the subject MSDS on the reader does not require scientific, technical, or specialized knowledge. Venture Tech asserts that expert testimony is not needed on the topic of whether the MSDS taken as a whole places the end user on notice that the diffusion fluid can burn and/or the reasonableness of any alleged warning contained in the MSDS. Also, Venture Tech argues that the MSDS is not intended for the consumer or retail use. Rather, the MSDS is prepared for employers in the occupational setting who are to train their employees concerning the labeling system and the MSDS. Venture Tech asserts that Dr. Armstrong is applying an incorrect and completely subjective standard to the MSDS. Also, Venture Tech states that Dr. Armstrong does not discuss OSHA regulations governing the MSDS's as they relate to "combustible" and "flammable" terms; rather, he refers to the dictionary definitions.[4] Additionally, Venture Tech argues that neither his opinions on the effect of the warning or the actual chemical properties have been tested and that his opinions have not been subjected to peer review. Also, Venture Tech states that Dr. Armstrong's testimony has been prepared only for this litigation. Further, Venture Tech asserts that the testimony of Dr. Armstrong should be excluded because his own statements demonstrate that his expertise lies only in chemistry. Venture Tech asserts that Dr. Armstrong admitted that his expertise is not in the cause and

---

[4]However, the Court notes that, in the deposition and at the Daubert hearing, Dr. Armstrong does define the terms according to scientific standards involving flash points and temperature ranges.

origin of fires.[5]

        iii)    Ogle

Ogle has joined in Citgo's motion, as well as Venture Tech's motion to exclude Dr. Armstrong's opinions. Further, Ogle asserts that Mr. Armstrong freely admitted in his deposition that he does not have any specialized knowledge, experience, or expertise that would qualify him to testify or render expert opinions as to the work performed on the subject HVAC system by Mr. Ogle, through Ogle's Repair Company, on September 3, 1999, and that in fact he had no idea what services Mr. Ogle or Ogle's Repair Company performed. Therefore, Ogle asserts that any testimony regarding duty and/or conduct by Ogle in HVAC repair should not be permitted.

        B.    Applicable law and analysis

The admissibility of expert testimony in a federal court is primarily governed by Fed. R. Evid. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

---

[5]However, the record reflects that his lectures and papers deal with fire chemistry. Further, in his deposition and at the Daubert hearing, Dr. Armstrong answers along the lines of "yes and no" as to whether he has training and experience in fire investigation. It appears that he applies fundamental science to the phenomenons that are reported.

With this in mind, a court must undertake a two-tiered inquiry when determining the admissibility of expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)*; Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)*; United States v. Smithers*, 212 F.3d 306, 315 (6th Cir. 2000). The first inquiry for a court's consideration is whether the reasoning or methodology underlying the expert's testimony is scientifically valid (reliability), and the second inquiry is whether that reasoning or methodology could be properly applied to the facts at issue to aid the trier of fact (relevance). *Id.* The reliability of the proffered expert testimony must involve an initial determination that the witness seeking to render the opinion is qualified to render an expert opinion in the designated area, which is disputed in the instant matter. Also, in the reliability analysis, a court must decide whether the proffered testimony is based on scientific, technical, or other specialized information, which is also disputed in the instant matter. The plaintiff bears the burden of demonstrating that its expert testimony comports with "sound science." *See Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997)

In regard to reliability, a court must carefully assess the methodology, reasoning, or technique that is employed by the expert to determine whether the expert's opinion is based on scientifically valid principles pursuant to Fed. R. Evid. 702. *See Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000); *Smithers*, 212 F.3d at 313; *Smelser*, 105 F.3d at 303. An expert's opinion may not be the expert's subjective belief or essentially unsupported speculation. *Smelser,* 105 F.3d at 303. In *Daubert,* the Supreme Court identified several factors to assist courts in evaluating whether a scientific theory or methodology constitutes reliable scientific knowledge. These include: (1) whether the

11

theory or technique can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether a technique has a known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or method has general acceptance in the scientific community. *Daubert*, 509 U.S. at 593-94.[6]  However, the analysis of reliability is flexible, and its indicators may vary from discipline to discipline. *Daubert*, 509 U.S. at 593; *Abon, Ltd. v. Transcontinental Ins.*, No. 2004-CA-0029, 2005 WL 1414486 (Ohio Ct. App. 5th June 16, 2005), *appeal not allowed*, 105 Ohio St. 3d 1408, 836 N.E.2d (2005)*; see also, Moore v. Ashland Chem. Inc.*, 126 F.3d 679, 686-88 (5th Cir. 1997).

In this regard, the expert's opinion must be based on methods and procedures that meet the level of intellectual rigor demanded by the relevant discipline. *See In re: Paoli*, 35 F.3d 717, 742 (3rd Cir. 1994).  The proposed testimony must be supported by appropriate validation, otherwise stated, "good grounds" based on what is known. *Id.; Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795.  The grounds for an expert's opinion merely have to be good; they do not have to be perfect. *Paoli*, 35 F.3d at 744.

In the case at bar, defendants assert that Dr. Armstrong is not qualified to testify as to the sufficiency and appropriateness of wording on an MSDS.  However, Dr. Armstrong intends to simply testify what a Ph.D chemist would conclude when reading an MSDS.  For

---

[6]The *Kumho Tire Co.* Court made it clear that the reliability analysis adopted in *Daubert* for scientific experts also applied to experts with other types of technical or specialized knowledge. *Kumho Tire Co., Ltd.*, 526 U.S. at 147, 119 S.Ct. at1174.

example, when a Ph.D chemist reviews an MSDS that states that a mixture is "non-flammable," the conclusion would be that the mixture would not burn. Qualifications of MSDS drafting, lecturing, and/or reviews, per say, are not necessarily needed for the subject testimony. Dr. Armstrong deals with the MSDS's on a regular basis. He reviews, analyzes, and uses the information provided on the MSDS as a regular part of his consulting work. In the Court's opinion, Dr. Armstrong's testimony is therefore admissible. Any arguments regarding Dr. Armstrong's lack of drafting, testing, etc. of warning can be proper areas for cross examination.[7]

Further, it appears that Dr. Armstrong is to testify about the auto ignition temperature of the diffusion fluid used at the Q-Zar facility, as well as the heat release and fuel load generated by the diffusion fluid. Defendants assert that Dr. Armstrong has not tested the subject diffusion fluid and, therefore, cannot render opinions regarding the chemical properties of the diffusion fluid. The Court finds that Dr. Armstrong possesses the requisite education and experience with respect to various chemicals, as well as the understanding of chemical properties. Since such testimony deals with a complex area of expertise of which a lay person would commonly have no knowledge, the testimony will be allowed.

---

[7]Indeed, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking expert testimony. Additionally, in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgement, Fed. Rule Civ. Proc. 50(a), and likewise to grant summary judgment, Fed. Rule Civ. Proc. 56. These conventional devices, rather than wholesale exclusion under an uncompromising "general acceptance" test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702. *Daubert*, 509 U.S. at 595-96.

The concerns of the defendants regarding the lack of testing performed by Dr. Armstrong go more to the weight of his testimony, rather than to its admissibility.

Moreover, Dr. Armstrong may also testify about the fuel load and "wicking" of the diffusion fluid, which he contends may increase the spread of the fire. Although the defendants argue that this testimony amounts to cause and origin testimony and that Dr. Armstrong cannot opine to such, the Court finds that Dr. Armstrong has sufficient training and experience in investigating chemicals in suspect fires and sufficient training, experience, and education regarding various chemicals and their chemical properties to allow him to give expert testimony in these areas. Thus, Dr. Armstrong may testify as to the diffusion fluid's fuel load, the wicking, and ignition with increased fire spread.

In addition, the Court notes that the defendants have set forth other areas where Dr. Armstrong has no knowledge or expertise in rendering an opinion, such as an opinion regarding Ogle's duty, breach, and causation. As the inadmissibility of such opinions are obvious, the Court will not permit such expert testimony. Accordingly, defendants' motions to exclude Dr. Armstrong's expert testimony are granted in part, and denied in part.

### IV. Motions for reconsideration of order on motion for summary judgment

#### A. Arguments

##### i) Venture Tech

Venture Tech has moved the Court to reconsider its holding that defendant Industrial Paper is not an apparent manufacturer. Essentially, Venture Tech's motion states that all claims originally asserted against Industrial Paper should proceed to trial on the merits.[8] The Court previously dismissed all claims against Industrial Paper with exception of plaintiff's claim based upon breach of warranty.

In connection with Venture Tech's motion, Venture Tech offers new evidence for the Court's consideration. This evidence includes an 8 ½ x 11 inch label that was allegedly affixed to the 55 gallon container of diffusion fluid. The label states in large letters, "DIFFUSION FLUID" and "Industrial Paper & Packing Corp." The label also gives the locations of Industrial Paper's offices and telephone numbers. Furthermore, Industrial Paper's logo is placed fourteen times upon the label.

According to Venture Tech, Venture Tech was asked by Industrial Paper to create and attach the subject label to the product when it sold the diffusion fluid to Industrial

---

[8]The plaintiff's original claims against Industrial Paper are based on products liability, breach of warranty, and negligence.

Paper. Also, Venture Tech states that the label described above was the only label on the product when it was shipped to the plaintiff. The original label on the product was removed at the specific request of Industrial Paper.

ii)    Industrial Paper

Industrial advances two arguments. First, Industrial states that Venture Tech waived its right to ask the Court to reconsider its ruling in that Venture Tech remained silent and allowed Industrial Paper's motion to be considered solely upon the arguments presented by Industrial Paper and the plaintiffs. In the alternative, Industrial Paper states that there is no basis to change the previous ruling. Industrial Paper states that it did not ask Venture Tech to place the labels upon the barrels. Also, the labels attached to the drums contain no representation that Industrial Paper was the manufacturer. Lastly, Industrial Paper argues that the MSDS states that the product was "manufactured for" Industrial Paper, and not *by* Industrial Paper.

iii)    Citgo

Citgo not only joins in the motion to reconsider Industrial Paper's involvement/liability in the matter, but also claims that the affidavit submitted by Richard Wills, as part of Venture Tech's motion, alters the legal analysis of plaintiff's claims against Citgo, specifically that Citgo did discharge its duty to warn plaintiff as a matter of law. The affidavit states that Venture Tech took off the labels of Citgo and also exchanged Citgo's

MSDS for the Industrial Paper /Venture Tech MSDS. With these new facts, Citgo advances the argument set forth in the case of *Jacobs v. E.I. Du Point De Nemours & Co.*, 67 F.3d 1219 (6th Cir. 1995). In *Jacobs*, the Court found that Du Point's duty to warn was discharged when (1) Du Point provided warnings to a knowledgeable intermediary; (2) when the intermediary's actions were the proximate cause of the plaintiff's injury, and (3) the intermediary is the only party with reasonable access to the end-user. Citgo also cites 29 C.F.R. § 1910.1200, which states in part that "each container of hazardous chemicals leaving the workplace is labeled, tagged or marked with the following information: (i) identity of the hazardous chemical(s); (ii) appropriate hazard warnings; and (iii) name and address of the chemical manufacturer, importer, or other responsible party." Citgo states that its automated system that sends an MSDS the first time the customer orders the product, anytime upon request, and/or anytime the MSDS is updated, sufficiently complies with federal regulations. The label affixed to the product merely states "DUOprime Oil 90" and "White mineral oil."

Lastly, Citgo also asserts that plaintiff's claims are barred as to the breach of warranty of merchantability and warranty of fitness for a particular purpose under Tenn. Code Ann. § 47-2-725. Citgo states that the diffusion fluid was last sold to Smoky Mountain Laser on July 31, 1998. Plaintiff filed the first complaint on September 5, 2002. Tenn. Code Ann. § 47-7-252 is a statute of repose that requires all actions for breach of warranty to be brought within four years of the tender of delivery. Again, the period begins at the tender of delivery. Citgo does not provide the date of tender, but only provides an invoice date. Plaintiff did not provide argument with respect to this issue.

17

B.    Applicable law and analysis

District courts have the inherent power to reconsider interlocutory orders and reopen any part of the case before entry of a final judgment." *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991); *see also Clark v. Traughber*, No. 04-1174-T/AN, 2006 WL 962602, at *1 (W.D.Tenn. April 11, 2006).  Until judgment is entered in the case, a court may "modify, or even rescind, such interlocutory orders."  *Mallory*, 922 F.2d at 1282.  As long as the district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient. *Leelanau Wine Cellars Ltd. v. Black & Red, Inc.*, 118 Fed.Appx. 942, 945 (6th Cir. 2004) (citations omitted).

The apparent manufacturer doctrine states that one who puts out as his own product a chattel by another is subject to the same liability as though he were the manufacturer. *Restatement 2d of Torts*, §400 (1964).  According to *Prosser, Law of Torts*, 3rd Ed., §96, one who labels a product with his own name or otherwise represents it to be his own is to be treated on the same basis as if he had manufactured it, and so is liable for any negligence on the part of the actual maker.

In *Bogart v. STP Corporation*, No. 301940, 1985 WL 301940, at *3 (Tenn.Cir.Ct. Oct. 2, 1985), the Court found that a "purchaser of an article ought to be able to rely upon the labeling of a product to identify the manufacturer; and in the absence of the name of the real manufacturer, the marketer named on the product ought to be conclusively presumed

to be the manufacturer." In the concurring opinion, Justices Samuel L. Lewis and William C. Koch held that "a seller of a product packaged under its own trade name cannot take advantage of the 'sealed container' defense when it [is] involved in any way in the production of the product." *Id.* at *6. The *Bogart* concurrence goes on to cite *Walker v. Decora, Inc.*, 225 Tenn. 504, 471 S.W.2d 778 (Tenn. 1971),[9] in which the Tennessee Supreme Court held that a company labeling a product with its own trade name or otherwise represented the product to be its own, treated the defendant company as the manufacturer, and held the defendant company strictly liable for damages resulting from the product. Lastly, the *Bogart* concurring opinion articulates that the rationale for imposing liability on the apparent manufacturer was a species of estoppel. *Id.* at 7.

"[T]he vendor, through its labeling or advertising of a product, caused the public to believe that it was the manufacturer and to buy the product in reliance on the vendor's reputation and care in making it, and was held to have assumed the obligations of a manufacturer and to be estopped to deny its identity as the manufacturer." *Herbel v. Sherman Equipment*, 92 Ill.2d 368, 371, 442 N.E.2d 199, 201 (Ill. 1982) (citations omitted). The loss caused by an unsafe product should be borne by those who create the risk of harm by marketing and distribution of unsafe products, those who derive economic benefit from placing them in the stream of commerce, and those who are in a position to eliminate the unsafe character of the product and prevent the loss. *Herbel,* 92 Ill.2d at 378-79, 442

---

[9]The *Walker* decision predates the enactment of Tennessee Products Liability Act of 1978 [T.C.A. §29-28-101 *et seq.*]. The product liability legislation contains certain provisions that have direct bearing upon the circumstances under which the "sealed container" defense can be invoked. However, the legislative history/debates make it evident that the General Assembly did not intend to modify the *Walker* decision. *Bogart*, WL 301940, at *8-9.

N.E.2d at 205.

Previously, the Court did not have the benefit of considering the label affixed to the 55 gallon drum of diffusion fluid when ruling upon Industrial Paper's motion for summary judgement. Given the evidence of the label, the Court finds that a question of fact exists as to whether Industrial Paper held the diffusion fluid out as its own product. Accordingly, Venture Tech's motion for reconsideration is granted, and all claims previously dismissed against Industrial Paper are reinstated.

As to Citgo's claim that it be dismissed, the Court denies this motion in that there is at least some question of fact as to the reasonableness of its warnings as previously explained in the Court's July 19, 2006 memorandum and opinion. First, the alleged intervening act, that is, the removal of Citgo's mineral oil label, does not necessarily equate to a conclusion that hazard warnings would have been removed. Second, although the Court is cognizant of the standard in *Jacobs*, the facts of this case differ. In the *Jacobs* case, Du Point did not have any reasonable access to end users of the product. The matter involved a component material in a medical device. In this case, Citgo clearly had reasonable means of access in view of the fact that the barrels sold by Citgo were the very same barrels that were supplied eventually to the end user. If Citgo had placed sufficient warnings directly onto the barrels, Citgo may have had access to the end user. Accordingly, the *Jacobs* case does not change the Court's decision previously set forth in the July 19, 2006 memorandum and opinion.

As to Citgo's assertion regarding the statute of repose, the Court was not supplied a date that delivery was tendered, but only an invoice date with a note that diffusion fluid would be delivered by truck. The Court was not supplied with the date of the truck's delivery and tender. While the Court is frustrated that the plaintiff failed to brief this issue, the Court does not have sufficient information to rule in Citgo's favor. Accordingly, the motion will be denied.

## V.  Motion in limine prohibiting any evidence alleging reliance on the skill/judgment of Industrial Paper of its salesman

### A.  Argument

Industrial Paper recites the Court's memorandum and opinion, which states that in order to maintain a claim for breach of implied warranty of fitness for a particular purpose, there must be proof "(3) that the buyer must have actually relied on the seller's skill or judgment." Industrial Paper files its motion stating that none of plaintiff's witnesses recall any communications with either Industrial Paper or its salesman, Roger Bowles, and that none of the plaintiff's witnesses can testify that they *actually relied* upon Mr. Bowles' "skills and judgment" at the time of purchase. In support of its motion, Industrial Paper cites *Fletcher v. Coffee Farmers Cooperative*, 618 S.W.2d 490 (Tenn.Ct.App. 1981), a matter in which the court determined that there was no actual reliance. Industrial Paper argues that since plaintiff has no admissible evidence of reliance on the skill and judgment of Industrial Paper or its salesman, that is, evidence of communication between plaintiff/plaintiff's witnesses and Industrial Paper, the plaintiff should be prohibited from

putting forth evidence in support of a claim for breach of implied warranty of fitness for a particular purpose.  Industrial Paper goes on to state that the Court, no doubt, assumed that, at trial, the plaintiff would come forward with some admissible evidence showing that it relied on one or more statements or representations made by Industrial Paper or its salesman in regard to the diffusion fluid.  Industrial Paper states that since it is now clear that the plaintiff has no admissible proof of reliance, the Court should prohibit the plaintiff from making such a claim.

Venture Tech[10] states that it purchased the mineral oil at issue from Citgo for eventual sale to Industrial Paper.  Thus, Venture Tech states that the legal arguments raised in Industrial Paper's motion in limine apply to the plaintiff's claim of breach of the implied warranty of fitness for a particular purpose.  Additionally, Citgo joins in Industrial Paper's motion, stating that plaintiff is unable to meet its burden to prove actual reliance as stated in *Fletcher v. Coffee Farmers Cooperative*, 618 S.W.2d 490 (Tenn.Ct.App. 1981).

B.      Applicable law and analysis

Where a buyer makes known to the seller the particular purpose for which he buys and relies upon the seller's skill or judgment, a warranty of fitness for a particular purpose arises.  It is apparent that there must be a superior knowledge of the goods on the part of the seller, which is the basis of his skill and judgment, and the buyer must inform the seller

---

[10]Venture Tech's motion is styled "motion in limine regarding implied warranty of fitness for a particular purpose."

either expressly or impliedly that he is relying upon that skill and judgment. In addition to this, there must be actual reliance by the buyer. The question of reliance is somewhat more difficult. Reliance involves a state of mind on the part of the buyer, which must be ascertained from the circumstances of the cases. *Weber Iron v. Steel Co. v. Wright*, 14 Tenn.App. 451, 1932 WL 1278, at *2-3 (Tenn.Ct.App. March 19, 1932). Whether or not an implied warranty of fitness for a particular purpose arises in any individual case is "basically a question of fact to be determined by the circumstances of the contracting." Tenn. Code Ann. § 47-2-315 cmt.1; *see also Lee's Home Center, Inc. v. Morris*, No. M2004-02158-COA-R#-CV, WL 1716797, at *4 (Tenn.Ct.App. June 21, 2006). In the instant matter, the Court finds that Roger Bowles, an employee of Industrial Paper, particularly reached out to the plaintiff to sell goods. Mr. Bowles knew of the use and purpose of the diffusion fluid. Obviously, through the testimony of Mr. Bowles, communication occurred in which it appears that Mr. Bowles was entrusted to select and furnish a product suitable for the fog machine. Accordingly, at this juncture, the issue will proceed to trial. Industrial Paper's motion in limine is therefore denied. As to Venture Tech, it appears that there is some evidence that Mr. Bowles told Venture Tech that he needed diffusion fluid for a fog machine. Venture Tech took and filled the order and explained in an MSDS that the product was non-flammable. Plaintiff should be given the opportunity at trial to prove that it relied upon Venture Tech's actions.

As to Citgo, it appears that plaintiff may have difficulty in proving reliance on Citgo's actions. However, this is not a summary judgment motion, but a motion in limine. Plaintiff will be given an opportunity to present its case at trial. Motions may be renewed at trial

after the close of plaintiff's proof.

### VI. Motion in limine to exclude from evidence the hearsay statement made by Ronald Ogle to plaintiff's expert Rodney Fowler

#### A. Arguments

Mr. Fowler's report states the following as to statements made by Mr. Ogle:

Ron Ogle has been working on the HVAC unit for twelve to fifteen years and before Mr. Montgomery began operating the amusement center. For the past four to five years, he and Mr. Montgomery have been talking about the units getting old and the need to be replaced. *Mr. Ogle advised that every time he worked on the unit, the interior of the units were saturated with an oily film from the fog machine they used in the laser arena. Mr. Ogle cleaned and wiped some of the film from the units every time he was called to do any type of repair work on the air-conditioners.*

On September 3, 1999, Mr. Ogle replaced a 5-ton compressor on the 15-ton air-conditioning unit. Mr. Ogle advised that the compressor was on the front side of the air-conditioning unit under the compressor fans and was not in the area of the exhaust fan, which was in the center of the unit around the heat strips.

(emphasis added). The Court notes that Mr. Ogle denies that he observed an oily film. Further, Mr. Fowler testified in his deposition that the statement made by Mr. Ogle was produced solely from Mr. Fowler's own memory.

Citgo moves to exclude the above statement from evidence at trial based on the rules against the admission of hearsay testimony, citing Fed. R. Evid. 703, 801, 802, 803, 804, and 807. Citgo emphasizes the portion of Rule 703 that states "facts or data that are

otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs the prejudicial effect." Citgo goes on to state that if the trial court determines that the underlying information should be disclosed to the jury, the disclosure can only be for that limited purpose. Citgo argues that an expert may not serve as a mere conduit to bring inadmissible hearsay to the jury. *See United States v. Stone*, 222 F.R.D. 334, 341 (E.D. Tenn. 2004). Citgo then asserts that the statement does not fit an exception of the hearsay rule. In addition, Citgo seeks to exclude the statement under Rule 403 stating that its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

Venture Tech states that Citgo sold them the subject mineral oil and that the legal arguments raised by Citgo would apply with equal force to the claims brought by Venture Tech. Thus, Venture Tech joins in Citgo's motion.

In response, plaintiff states that the motion borders on being frivolous, and that it is beyond peradventure that an expert may rely on hearsay testimony. Therefore, Mr. Fowler's testimony regarding his interview with Ronald Ogle is clearly admissible. Plaintiff asserts that an expert may gain a factual predicate for his opinions and inferences from data made available outside of court. Additionally, plaintiff asserts that the statement may be used as an admission.

B.    Applicable law and analysis

It is undisputed that an expert may rely on hearsay testimony.  An expert may gain a factual predicate for his opinions and inferences from data made available outside of court.  This broad basis for expert opinions permits reliance on facts gleaned from such sources as reports, interviews, or even the opinions of other experts.  *See Auvil v. CBS 60 Minutes*, 836 F. Supp. 740, 741 (E.D. Wash. 1993), aff'd, 67 F.3d 816 (9th Cir. 1995); s*ee also Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance*, Inc., 878 F. Supp. 884, 887 (E.D. La. 1995).  It is clear under Rule 703 that the data underlying the expert opinion need not itself be admissible as evidence, as long as the data is of a type relied upon by experts in the particular field and if such reliance is reasonable. It is clear that fire investigators like Rodney Fowler rely on interviews in forming their opinions. This is permitted by NFPA 921. Further, Mr. Fowler's testimony regarding his interview with Ronald Ogle has probative value, which tilts in favor of its admissibility.

The Court will instruct the jury that Ogle's statements as to defendants, Industrial Paper, Venture Tech, and Citgo, can only be used in evaluating Mr. Fowler's testimony and not for the truth of the matters asserted in the alleged statements.

Additionally, it also appears Mr. Ogle's statements comprise an admission against Ogle, which is admissible as to Ogle and to which the jury must engage in a credibility analysis.  However, when multiple defendants are involved, an admission by one defendant is only admitted against that particular defendant but not the others.  *See State v. Kyger*,

787 S.W.2d 13, 30 (Tenn.Cr.App. 1990).  The Court will instruct the jurors that each defendant should be given separate consideration, along with the evidence against each one, i.e. the alleged statement by Mr. Ogle regarding an oily film on or near the motor will be specifically limited to defendant Ogle.

VII.     **Motion in limine to exclude from evidence the testimony of Rodney E. Fowler on the basis that there is no evidentiary foundation to support his testimony**

A.     Argument

Besides repeating the arguments in the motion discussed immediately above, Citgo also asserts that Mr. Fowler seeks to testify to conclusions and opinions that have no basis in the evidence.  Defendant states that Mr. Fowler testified that Mr. Ogle did not actually state that the diffusion fluid was in the ductwork, but that it was in the air conditioning unit. In explanation, Mr. Fowler stated "[b]ut the two are connected, so if it's one place - the duct system runs actually into the air conditioning unit....  I consider it one system."  In analysis of this testimony, Citgo states that it is a "leap" to simply assume that if Mr. Ogle told him there was diffusion fluid or an oily film near the motor, it automatically must be present in the ductwork.  Citgo cites an Eastern District of Tennessee case, *Robinson v. Union Carbide Corp.*, 805 F.Supp 514 (E.D. Tenn. 1991), involving mercury poisoning of plaintiffs by ingesting fish allegedly contaminated with mercury, which was allegedly placed in the water by the defendant.  The court granted the motion for summary judgment because assumptions made by plaintiff's expert zoologist were made without a sufficient basis to

27

conclude that plaintiff's injury was caused by defendant's conduct.  The court found that there was nothing in the record to support the assumption that fish flesh in the areas where the decedents fished contained an average mercury content of .33 ppm during the relevant time period.  According to this case, as well as others cited, Citgo asserts that the Court should exclude the testimony of Mr. Fowler.

Again, Venture Tech states that Citgo sold them the subject mineral oil and that the legal arguments raised by Citgo would apply with equal force to the claims brought by Venture Tech.  Thus, Venture Tech joins in Citgo's motion.

        B.      <u>Applicable law and analysis</u>

As the Court has above ruled on the motion in limine to exclude from evidence the hearsay statement made by Ronald Ogle to plaintiff's expert Rodney Fowler, Mr. Fowler may rely on the alleged statements in forming his opinion.  Further, the Court finds that the alleged statements of Mr. Ogle are not unfairly prejudicial.  As to the alleged "leap," that is, assuming that if there was diffusion fluid or an oily film near the motor, it must automatically be present in the ductwork, the Court does not agree, as a conclusion, with the defendants. A juror may consider all of the surrounding circumstances at the time of the event or occurrence when weighing the testimony of a witness.   A juror is to apply universally recognized physical laws or well established physical facts.  The jurors will be permitted to

use this evidence in consideration of the plaintiff's claims and the asserted defenses.[11]

If the jurors determine that diffusion fluid was on or near that motor, which is located on the roof, it may not be a leap, upon presentation of the evidence, but common sense that the diffusion fluid traveled from inside the arcade through the ventilation to the motor. This is not a case where the subject material can come from any number of sources and where there is no isolation of the material. Accordingly, at this juncture, defendants' motions are denied.

## VIII.  Conclusion

For the reasons stated at oral argument, defendant's motion for leave to file cross-claim [Doc. 139] is **GRANTED**; defendant's motion in limine regarding testimony of Brad White and Dayne Grey [Doc. 174] is **DENIED**; defendant's motion in limine to prohibit any statements or references intended to incite anti-Venezuela sentiment or anti-Hugo Chavez sentiment [Doc. 175] is **GRANTED**; and plaintiff's motion for leave to take the deposition of Robert Montgomery for the purposes of presentation at trial [Doc. 210] is **GRANTED**.

For the reasons hereinabove set forth in the Court's memorandum and opinion, defendants' motions in limine to bar all testimony of Rodney E. Fowler for spoilation of the evidence [Doc.s 167, 169, and 170] are **DENIED**; defendants' motions in limine to exclude

---

[11]The defendants engaged in some discussion at oral argument as to the schematics of the ductwork and machinery, as well as the building structure in general.  However, the issues regarding separate systems, filters, etc. were not developed sufficiently for the Court to conclude as a matter of law that evidence regarding an oily film on or near the motor should be excluded.

the proposed testimony of Andrew T. Armstrong, Ph. D [Doc.s 137, 140, and 152] are **GRANTED in part** and **DENIED in part**; defendants' motions to reconsider the Court's memorandum and opinion [Doc.s 155 and 178] are **GRANTED in part** and **DENIED in part**; defendant's motion in limine prohibiting any evidence alleging reliance on the skill/judgment of Industrial Paper of its salesman [Doc. 163], as well as defendants' motions in limine regarding implied warranty of fitness for a particular purposes [Doc.s 180 and 184] are **DENIED**; and defendants' motions in limine to exclude from evidence the hearsay statement allegedly made by Ronald W. Ogle to plaintiff's expert Rodney E. Fowler [Doc.s 171 and 185] are **DENIED**; and defendant's motions in limine to exclude from evidence the testimony of Rodney E. Fowler on the basis that there is no evidentiary foundation to support his testimony [Doc.s 182 and 186] are **DENIED**.

**IT IS SO ORDERED.**

ENTER:

s/Thomas W. Phillips
UNITED STATES DISTRICT JUDGE